UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------

UNITED STATES OF AMERICA,

      Plaintiff,

   v.

STEPHEN J. COX,

      Defendant.

---------------------------------------------------------------

Docket No.: 14-CR-516 (AKH)

**REDACTED**

## SENTENCING MEMORANDUM OF STEPHEN J. COX

Thomas C. Frongillo
PIERCE BAINBRIDGE BECK PRICE &
HECHT, LLP
One Liberty Square, 13th Floor
Boston, MA 02109
Telephone: (617) 401-7289
Facsimile: (617) 313-7837
tfrongillo@piercebainbridge.com

Melissa Madrigal
PIERCE BAINBRIDGE BECK PRICE &
HECHT, LLP
277 Park Avenue
New York, NY  10172
Telephone: (212) 972-0201
Facsimile: (646) 968-4125
mmadrigal@piercebainbridge.com

DATE:  July 18, 2019

*Attorneys for Stephen J. Cox*

# TABLE OF CONTENTS

I.     PRELIMINARY STATEMENT ................................................................................ 1

II.    PERSONAL BACKGROUND................................................................................. 2

    A.    Mr. Cox's Upbringing and Education................................................................. 2

    B.    Mr. Cox's ███████████████████████ ............................................. 3

    C.    Mr. Cox's Initial Employment at Altec (2000-2005) ............................................ 4

    D.    Mr. Cox's Attempt to Change His Lifestyle (2005 to 2008) .................................. 4

    E.    Mr. Cox's Reluctant Return to Altec When His Father Was Diagnosed with Brain Cancer (2008) ................................................................... 6

    F.    Mr. Cox's Unsuccessful Effort to Convince His Father to Close Altec (2009) .......................................................................................................... 7

    G.    Mr. Cox's New Life with His Wife Sabrina and ███████████ ██████████ (2012 to Present) ............................................................... 7

    H.    Mr. Cox's Founding and Operation of Town Center Transportation .................... 9

    I.    Mr. Cox's Commitment to His Community and At-Risk Children........................ 9

III.    THE OFFENSE CONDUCT ................................................................................. 11

    A.    Mr. Cox's Work at Green Valley......................................................................... 11

    B.    Mr. Cox's Work with the Nelsons ....................................................................... 12

IV.    ████████████████████████████ .................................................. 13

V.    ARGUMENT ........................................................................................................ 14

    A.    ████████████████████████████ ████████████ .................................................................................................... 14

    B.    ██████████████████████████████ ............................ 14

        1.    A Non-Custodial Sentence Is Warranted because of Mr. Cox's Personal and Family Circumstances.......................................... 15

        2.    A Non-Custodial Sentence Is Sufficient to Satisfy the Goals of Specific and General Deterrence................................................ 16

        ████████████████████████████████████

VI.    CONCLUSION...................................................................................................... 19

## TABLE OF AUTHORITIES

Page(s)

CASES

*Gall v. United States*,
    552 U.S. 38 (2007).................................................................................................................17

*United States v. Cavera*,
    550 F.3d 180 (2d. Cir. 2007) ...................................................................................... 14, 15

*United States v. Coughlin*,
    2008 WL 313099 (W.D. Ark. Feb. 1, 2009) ...............................................................17

*United States v. Crosby*,
    397 F. 3d 103 (2d Cir. 2005) ........................................................................................14

*United States v. Ghailani*,
    733 F.3d 29 (2d Cir. 2013) ............................................................................................18

*United States v. Leitch*,
    2013 WL 753445 (E.D.N.Y. Feb. 2, 2013)..................................................................17

*United States v. Redemann*,
    295 F. Supp. 2d 887 (E.D. Wis. 2003) ................................................................. 17, 18

STATUTES

18 U.S.C. § 3553(a) ............................................................................................................ 14, 19

18 U.S.C. § 3553(a)(1).............................................................................................................14

18 U.S.C. § 3553(a)(2)...............................................................................................................2

18 U.S.C. § 3553(e) ............................................................................................................. 1, 13

I.       **PRELIMINARY STATEMENT**

Stephen Cox has pled guilty to various crimes based on his participation in a nationwide scheme to divert and resell prescription medications.  His offenses are serious.  He understands that he alone is responsible for them.

Mr. Cox was charged by a criminal complaint in January of 2014.  He self-surrendered and immediately began to atone for his conduct. ████████████████ ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████

████████████████████████████████████████████████████████

██████████████████ ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

Equally important, Mr. Cox now lives a meaningful life as a productive member of society. ████████████████████████████, Mr. Cox has been gainfully employed.  He and his wife, Sabrina, formed a car transportation business in Sugar Land, Texas and have two employees.  He has donated his car services to local groups and various fundraisers.  For the past five years, Mr. Cox also has volunteered at an organization that assists residents from an impoverished area near

Houston.  On a weekly basis during the school year, Mr. Cox teaches at-risk children, helps them with their schoolwork, and serves as their mentor, soccer coach, and friend.  In many respects, Mr. Cox's efforts to get his life back on track serves as an inspiration to others.

In effect, Mr. Cox has been on probation for 5½ years and has met all typical conditions in an exemplary manner.  He has passed all drug and alcohol tests and held a job.  He has committed no crimes and has complied with all reporting dates.  His rehabilitation is noteworthy; he poses no danger to others and is not a likely candidate for recidivism.  We respectfully urge the Court to impose a non-custodial, probationary sentence.  Such a sentence would be "sufficient, but not greater than necessary" to achieve the purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2).

## II.    PERSONAL BACKGROUND

### A.    Mr. Cox's Upbringing and Education

Mr. Cox was born and raised in Jackson, Mississippi as the only child of Michael and Elizabeth Cox.  He has two older half-brothers, John Blake and David Cress, from Mrs. Cox's first marriage.  When Mr. Cox was five years old, the family moved to Memphis, Tennessee.  One year later, the family moved again, this time to Spruce Pine, North Carolina, a small town near Boone.

The Coxes were a middle-class family.  While living in North Carolina, Mr. Cox's father, Michael Cox, worked in the real estate industry for a couple of years before becoming a sales representative for various generic pharmaceutical companies.  In the late 1990s, Michael Cox formed and owned a company engaged in wholesale distribution of prescription drugs known as Altec Medical Inc. ("Altec"), which was based in Easley, South Carolina.  Elizabeth Cox worked as a substitute school teacher.

In 1997, Mr. Cox graduated from Watauga High School in Boone.  He was an average student who participated in soccer, golf, and the drama club.  During high school, Mr. Cox worked at a pizza shop and installed car stereos.  Following graduation, Mr. Cox attended the University of

Tennessee. ██████████████████████, Mr. Cox did not satisfy the University's academic requirements and withdrew after several semesters without earning a degree.

**B.**   ████████████████████████

████████████████████████████████████

██████████████████. ████████████████████████████████.

████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

██████████████

██████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████

██████████████████████████████████████

████████████████████████████████████

██████   Fearful of expulsion, Mr. Cox was able to buckle down to improve his academic performance in his second semester.  The University permitted him to return in the fall of 1998.

Mr. Cox's sophomore year was disastrous: he failed academically and was forced to leave the University.  Unwilling to quit on higher education, Mr. Cox took courses at two community colleges, hopeful that the University might permit him to re-enroll.  Based on his performance, the University gave him a second chance to attend classes in the fall of 1999. ████████████████████████

████████████████████████████████████████████

████████████████████████████████████

████████ He unsuccessfully attempted to exit a highway while speeding and flipped his car over several times.  Miraculously, Mr. Cox survived.  Although his wounds healed over time, his college days were over.

### C.      Mr. Cox's Initial Employment at Altec (2000-2005)

When Mr. Cox returned to Boone to live with his family, ██████████████████████████ ██████████████████████████ with no special job skills.  His life was going nowhere.  He was at a dead end.  Michael Cox asked his son to work for him at Altec, which Mr. Cox did from 2000 to 2005.  Initially, Mr. Cox worked in the warehouse, where he assisted with shipping and receiving prescription drug products.



████████████████ He had stretches where he did not sleep for days.  He lost an unhealthy amount of weight and became ill.  He often missed work and performed poorly on the job.

At some point, Mr. Cox suspected Altec's sale of prescription drugs was illegal because it was buying prescription medications on the black market and reselling them to other distributors at a profit.  This led to many contentious arguments between Mr. Cox and his father about the business.  After a falling out between them in 2005, Mr. Cox quit his job.

### D.      Mr. Cox's Attempt to Change His Lifestyle (2005 to 2008)

Over the next three years, Mr. Cox made a concerted effort to change his lifestyle.  He moved to a condominium in Linville, North Carolina, and worked as a waiter for a respected restaurant for a year, earning enough money to get by.

In early 2006, the Executive Director of The Crossnore School, Phyllis H. Crain, Ed.D,

offered Mr. Cox a position as the school's fitness center instructor (Ex. A).[1]  The Crossnore School is a nonprofit organization that provides accommodation and education to at-risk youth.  The school offers residential programs to victims of substance abuse.  It also cares for children without parents and guardians and provides 90-day residential programs for neglected children.

Mr. Cox worked at The Crossnore School from March 2006 to March 2008 (Ex. A).  As described by Executive Director Crain, Mr. Cox was the physical education teacher at the charter school from 8 a.m. to 3 p.m. each day, teaching children's physical education classes (Ex. A).  He also worked with students in the school's vocational education classroom, helping to teach entrepreneurialism and business skills in the school's coffee shop (Ex. A).  In addition, Mr. Cox offered afternoon and evening fitness classes for students and staff in the fitness center (Ex. A).

Executive Director Cain had high praise for Mr. Cox's professionalism and many contributions to the school, its students, and its staff.  She viewed him as a conscientious, compassionate, and dependable employee:

> During the time that Stephen was employed at The Crossnore School he was the most conscientious employee.  He was a model of dependability – always on time and the most incredible model of professionalism in dress and demeanor.  Stephen was deeply compassionate for our students and understanding of the circumstances that brought them into residential care, yet he always held them to a higher standard.  The students looked up to him and respected him immensely (Ex. A).

From Executive Director Cain's perspective, it was a "mutual admiration society" at the school: "[Mr. Cox] adored the students and the students adored him" (Ex. A).  While at The Crossnore School, Mr. Cox appeared to have turned the corner.  He told Executive Director Cain, "[T]his had been one of the happiest times in his life" (Ex. A).

Unfortunately, this positive experience came to an abrupt halt in early 2008, when Mr. Cox's

---

[1] Exhibit A is a copy of a letter from Phyllis H. Crain, Ed.D, the Executive Director of The Crossnore School dated April 28, 2010 regarding Mr. Cox's employment at the school.

father was diagnosed with an aggressive, cancerous brain tumor and had to undergo immediate surgery and treatment at Duke Medical Center (Ex. A).  Mr. Cox resigned from The Crossnore School to help run his father's business (Ex. A).  The Crossnore School considered his departure to be "a great loss," as Mr. Cox had a "rare" gift and a "heart of compassion" to truly make a difference in the lives of those in need (Ex. A).

### E.     Mr. Cox's Reluctant Return to Altec When His Father Was Diagnosed with Brain Cancer (2008)

Michael Cox's sudden illness altered the course of Mr. Cox's life.  Though only 52 years old, physicians gave Michael Cox just 6 to 8 months to live (Ex. B).[2]  According to Mr. Cox's half-brother, David Cress, Michael Cox's condition had a traumatic impact on his family, particularly Mr. Cox:  "Then my stepfather was diagnosed with a brain tumor and our family was thrust into a world that we could not have ever expected or could have prepared for.  It was doubly hard on Stephen because my stepdad and Stephen were best friends but also worked together.  I know how hard this was on me and my kids and my mother but I cannot imagine how hard it must have really been on Stephen" (Ex. C).[3]

Believing he only had a few months to live, Michael Cox asked his son to leave his job at the Crossnore School and take over Altec's business.  His parents explained they needed Mr. Cox to operate the business so they could maintain health insurance to pay for medical treatment and continue to have financial security.  Although Mr. Cox had left the black-market drug world in 2004, he felt he had no choice but to honor his parents' wishes.

Initially, Mr. Cox resumed working in the warehouse but soon took on more responsibilities, such as handling accounts and contacts.   In the meantime, Michael Cox's condition continued to

---

[2] Exhibit B is a letter to the Court from Elizabeth Cox, Mr. Cox's mother, dated June 27, 2019.

[3] Exhibit C is a letter to the Court from David O. Cress, Mr. Cox's half-brother, dated June 28, 2019.

rapidly deteriorate (Ex. B).  Apart from helping run Altec, Mr. Cox did everything he could to care for his father.  As Mrs. Cox observed in her letter to the Court, "Stephen was always by my side during this time through surgeries and treatment" (Ex. B).  He assisted with his father's medical care and spent time with him on a daily basis (Ex. B).

Michael Cox's grim condition caused Mr. Cox to fall into a deep state of depression. ███

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

### F.    Mr. Cox's Unsuccessful Effort to Convince His Father to Close Altec (2009)

In just over one year, Altec's business fell under federal criminal and regulatory scrutiny as a result of its purchase and resale of a large quantity of stolen insulin.  In late July of 2009, the U.S. Drug Enforcement Administration ("DEA") and the U.S. Food and Drug Administration ("FDA") executed search warrants at various businesses involved in the distribution of the stolen insulin, including Altec.  Following the raid, Mr. Cox urged his father to close Altec.  Michael Cox declined to do so.  He was still undergoing medical treatment and needed the company's health insurance.

Shortly thereafter, in early August of 2009, Mr. Cox had an altercation with his parents. ███

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████

### G.    Mr. Cox's New Life with His Wife Sabrina ████████████████
████████ (2012 to Present)

In November of 2011, Mr. Cox met his current wife, Sabrina. ██████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████ ▌ In Sabrina's words:  "[O]ur relationship had turned toxic,

and unless we were both willing to make some major changes there was no way we could be

together" (Ex. D at 1).  Inevitably, the couple split within a few months.

████████████████████████████████████████████████████

████████████████████████  ████████████████████████████████████

█████████████████████████████████████████████  A tragic

event in mid-March 2012 occurred that became a turning point for both Mr. Cox and Sabrina.

Sabrina's best friend died unexpectedly.  █████████████████████████████████████

███████████████████████████████████  He helped Sabrina get through the trauma

and pain of her friend's untimely death.  From that point forward, the couple was inseparable (Ex. D

at 2).

In December 2012, Mr. Cox and Sabrina were married.  Sabrina recalls: "At this point, we

started to become functioning members of society.  ████████████████████████████████

████████████████  We started to get to know members of the community that we would often

see, and felt like we finally belonged" (Ex. D at 2).  ███████████████████████████████

██████████████████████████████████████████████  Mr. Cox

also focused on his health and developed a passion for long-distance trail running, █████████

████████████████████  To date, he has completed long-distance trail runs of 31, 50, and 100

miles.

████████████████████████████████████████████ . █████

████████████████████████████████████████████████

███████████████

---

[4] <u>Exhibit D</u> is an undated letter to the Court from Sabrina Cox, Mr. Cox's wife.

### H.      Mr. Cox's Founding and Operation of Town Center Transportation

While on pre-trial release, Mr. Cox, with Sabrina's help, has formed and operated a car

transportation company called Town Center Transportation.  Town Center Transportation is based

in Sugar Land, and services residents of suburban Houston.  Mr. Cox employs two full-time drivers

and works with several independent drivers.  According to Sabrina:  "Stephen worked very hard to

get the business off the ground.  We created flyers and [Stephen] personally handed them out to

thousands of homes in the area.  He answered the phone day and night to take calls for trips and

make reservations" (Ex. D at 2).  Over the years, Mr. Cox has donated his services to local groups,

including the Rotary Club and various fundraisers.

### I.      Mr. Cox's Commitment to His Community and At-Risk Children

Mr. Cox and Sabrina also made a conscious decision to contribute to their local community

in a meaningful way by performing volunteer work with at-risk children for an organization known

as Attack Poverty (Ex. D).  Attack Poverty assists residents of poverty-stricken areas by establishing

"Friends Communities" in those locations.  In the City of Richmond, Texas, Attack Poverty has one

such location called Friends of North Richmond (Ex. E).[5]  The mission of the Friends of North

Richmond is to strengthen the North Richmond community through education, revitalization, and

spiritual growth (Ex. E).  The Friends of North Richmond program relies on volunteers to donate

their time and effort to form long-lasting, genuine relationships with community members (Ex. E).

According to Elise Kaufman, the Director of Friends of North Richmond, Mr. Cox has

been a volunteer since 2014, working mainly at You Can Academy, an after-school tutoring program

(Ex. E).  For the past 5 years, Mr. Cox has "encouraged elementary aged students who are at risk of

not completing high school to live into their full potential" (Exs. D and E).  During every week of

---

[5]  Exhibit E is a letter to the Court from Elise Kaufman, the Director of the Friends of North Richmond, dated July 1, 2019.

the school year, Mr. Cox has worked with students from 2:45 p.m. to 5 p.m. (Ex. E).  In that period, he has read to students, given them homework, listened to their problems, advised them on difficult family situations, and provided them with authentic care (Ex. E).  Students know when Mr. Cox is coming and get "excited when he walks through the doors" (Ex. E).

In the past year, Mr. Cox led the elementary school aged students' soccer program (Ex. E). Each week, he ran team members through drills, taught them good sportsmanship, and coached their games (Ex. E).  He has been a role model for the students, showing them genuine love and compassion and demonstrating leadership (Ex. E).  Mr. Cox's work with at-risk children at Friends of North Richmond was a natural extension of his teaching of needy children at The Crossnore School from 2006 to 2008.  According to Sabrina, he has always had a "soft spot in his heart" for children (Ex. D at 3).  In describing Mr. Cox's contributions to the Court, Director Elise Kaufman captures the positive impact that he has had on children in the community as follows:

> His level of compassion and care for the students in showing up every week in addition to taking on additional responsibilities are the tangible fruits of a person who has a heart to not only reach his full potential but to encourage others to do the same.  We are thankful for Stephan [sic] volunteering with us because he is an example to the children of someone who knows he is not perfect but does not use that as an excuse to not make an impact with his life.  The children have learned from Stephen that no one is perfect, but the beauty is that it does not take perfect people to work towards creating the world we want to see come to fruition – of love, justice and empowerment (Ex. E).

Mr. Cox's compassion for others is also discussed in David Cress's letter to the Court (Ex. C).  Mr. Cress, an older brother, describes his discussions with Mr. Cox, who inspired and guided him to become a school teacher:  "When I was struggling to find my own career path [Stephen] was the one who convinced me to follow my heart and become a school teacher . . . .  Since then he has been there for me and inspired me to create a new academy system in public schools to help kids learn employability skills before graduating high school.  His past, experience, and guidance helped me identify what students need most in their education to avoid the pitfalls that he went through"

(Ex. C at 1).

Mr. Cress also characterizes Mr. Cox as "the kindest and most loving person in the room," who is "a genuinely caring and considerate human being who would do anything for anyone if they needed him" (Ex. C at 1).  His mother, Elizabeth Cox, offers a similar perspective: "Stephen and [Sabrina] have such big hearts . . . when Hurricane Harvey hit Houston, they took supplies to people that were staying in shelters and motels" (Ex. B).

Mr. Cox has undoubtedly transformed his life. 

formed and operated a successful business with two employees; and financially supported his family.  Importantly, he has selflessly volunteered to mentor, coach, and befriend scores of disadvantaged children.  Mr. Cox's ████ and conduct over the past 5 years demonstrates his unequivocal commitment ████████ .  He has truly turned the corner.

## III.   THE OFFENSE CONDUCT[6]

### A.   Mr. Cox's Work at Green Valley

After leaving the Hanley Center in early 2010, Mr. Cox quickly returned to the drug diversion business by moving to Utah and working for Green Valley Medical Distributors ("Green Valley"), a significant drug diverter based in St. George, Utah.  Randy Crowell, the founder and owner of Green Valley, offered Mr. Cox a job.  Before forming Green Valley, Crowell was Altec's top broker, earning monthly commissions by identifying customers to purchase Altec's products. Mr. Cox worked at Green Valley from January 2010 to November 2011. ████████

████████████████████

Green Valley's business was similar Altec's.  The company operated a nationwide scheme to

---

[6] Mr. Cox adopts the offense conduct described in his plea allocution, the Presentence Investigation Report, ████████████ he includes additional relevant information in this memorandum for the Court's reference.

divert and sell prescription medications, primarily those used to treat HIV/AIDS.  Green Valley purchased thousands of bottles of these second-hand specialty medications before re-selling them. To facilitate the scheme, Green Valley utilized sham drug pedigree documents to disguise the true distribution history of the prescription drugs and make them appear to have been acquired through a legitimate distribution pipeline.

Crowell spearheaded the operation from his home in Las Vegas.  He interfaced with prescription drug suppliers and customers and handled most of Green Valley's accounts.  Mr. Cox, on the other hand, managed Green Valley's warehouse.  This included unpacking boxes of prescription medications received from black market sources, conducting quality control inspections of the drugs for irregularities, and shipping drugs to customers.  In November 2011, Mr. Cox quit his job after a dispute with Crowell.

### B.   Mr. Cox's Work with the Nelsons

Mr. Cox then moved to Sugar Land, Texas, where he performed similar work for Ken Nelson and his father, Joe Nelson.  Mr. Cox knew about the Nelsons from his work at Altec and through Alex Oria, a leading drug diverter who previously sold drugs to Altec and lived near Sugar Land.  The Nelsons conducted a prescription drug diversion business, known as KPP, directly from Ken Nelson's home.  UPS delivered boxes of drugs to the house; they were stored in the garage. Mr. Cox shipped orders of prescription drugs from the Nelson home.  He also earned some commissions on drugs he sold to customers, including Green Valley.

By March of 2012, KPP fell under federal investigation, and Mr. Cox stopped working with the company.  A couple of months later, Ken Nelson opened a new wholesale drug distribution company in Mississippi named Rymar.  Rymar also was a drug diverter.  Mr. Cox assisted the Nelsons on a part-time basis.  By the end of June 2012, Mr. Cox left the drug diversion business and never returned.

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

## V.   <u>ARGUMENT</u>

**A.**   [REDACTED]

A district court should begin all sentencing proceedings by correctly calculating the applicable Sentencing Guidelines.  *See United States v. Crosby*, 397 F. 3d 103, 112-13 (2d Cir. 2005). Here, the parties and the U.S. Probation Department agree that Mr. Cox's Sentencing Guidelines level is 30, and the applicable sentencing range is 97 to 121 months' imprisonment (PSR ¶ 117). Once the offense level is calculated, the district court must next consider any applicable departures.

[REDACTED]

[REDACTED]

[REDACTED]

**B.   A Non-Guideline, Non-Custodial Sentence Is Warranted under 18 U.S.C. § 3553(a)** [REDACTED]

After calculating a defendant's applicable Guidelines sentence, a district court must conduct an independent review of the sentencing factors set forth in 18 U.S.C. § 3553(a), taking into consideration "the nature and circumstances of the offense and the history and characteristics of the defendant."  *See United States v. Cavera*, 550 F.3d 180, 189 (2d. Cir. 2007); 18 U.S.C. § 3553(a)(1).  The district court must impose a sentence that is "sufficient, but not greater than necessary" to, in pertinent part:

(1)     reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense (Section 3553(a)(2)(A));

(2)     afford adequate deterrence to criminal conduct (Section 3553 (a)(2)(B));

(3)     protect the public from the defendant's further crimes (Section 3553(a)(2)(C)); and

(4)     promote rehabilitation (Section 3553(a)(2)(D)).

The sentencing court has wide latitude to decide the proper punishment for an individual offender and a particular crime.  *Cavera*, 550 F.3d at 188.  ██████████████████████████████

Section 3553(a), a non-custodial sentence is appropriate for Mr. Cox.

> **1.      A Non-Custodial Sentence Is Warranted because of Mr. Cox's Personal and Family Circumstances**

Mr. Cox's "history and characteristics," including his past and present personal and family circumstances, support imposition of a non-custodial sentence.  As demonstrated above, Mr. Cox has made an extraordinary transformation of his life in the past 5½ years.  Previously, ██████████ ████████████████ living an aimless life and mired in the drug diversion business.  Today, █████████ ██████, married, a small business owner, and a contributor to his community.

Having dropped out of college, Mr. Cox initially became an unwitting participant in the drug diversion business when he joined his father's company, Altec.  After quitting his job, Mr. Cox made a concerted effort to clean up his life.  He achieved some success when teaching at-risk children at The Crossnore School for two years.  Unfortunately, his stay at The Crossnore School suddenly ended when his father was diagnosed with terminal brain cancer.  Mr. Cox reluctantly returned to Altec, mainly to ensure that his family would have health insurance and financial support.  ██ ██████████████████████████████████████████████████████████████████ He was once again a participant in the drug diversion world until the DEA and FDA shut down Altec's business.

████████████████████████████████████████████████



When Mr. Cox met his wife Sabrina, ███████████████████████, he made a definitive decision to leave the drug diversion business, never to return.  Over time, ██████ ████████████████████████████████.  The path was not an easy one to traverse; there were many setbacks and challenges.  But for the past 5½ years, Mr. Cox has been a ███████ ████████ productive member of society.

Sabrina describes the dramatic changes that have occurred in the couple's lives: "Our lives have changed so much since we first met, and we often joke that the way we used to live doesn't even seem real.  We are a real family with real, authentic relationships.  This is something that we both never thought we could have" (Ex. D at 3).  Sabrina goes on to say, "Sure, bad things happen – Stephen lost his father, I have lost several family members, we found out we are not able to have children, [Stephen's] legal case, but we both know how bad things can get and are so grateful for the life we now have" (Ex. D at 3).  Mr. Cox's older brother, David Cress, similarly writes:

> I know [Stephen] better than anyone and I can assure you that his best days are ahead of him.  His most productive days are ahead of him.  Please allow my brother to continue to add to society through his good works and charity.  Please continue to allow him to give his time and energy to volunteering.  Please allow him to continue building his business and employing more and more people.  Please don't take him away from his family.  We need him (Ex. C at 2).

Mr. Cox's "history and characteristics," as reflected in his personal and family circumstances, demonstrate his impressive rehabilitation.  A sentence of incarceration could trigger a major setback, causing damage to Mr. Cox, his family, and the community in general.

### 2.     A Non-Custodial Sentence Is Sufficient to Satisfy the Goals of Specific and General Deterrence

Mr. Cox's crimes ended in 2012, over seven years ago.  Since that time, Mr. Cox has had no

intervening incidents of criminal conduct.  Now, at age 40, he has much to lose.  Mr. Cox is a husband, business owner, and an employer.  He has a stable family environment and strong support network.  Given ██████████████████████████ other achievements, it is unlikely that he will be a recidivist.

Moreover, Mr. Cox's five-year involvement with the criminal process has taken a toll on him and his family.  He will be a convicted felon for the rest of his life.  This will preclude him from engaging in certain rights of citizenship and may impose limits on successes that he might otherwise achieve.  The stigma of a felony conviction, the collateral consequences of that conviction, and restrictions attendant to a probationary sentence will ensure that Mr. Cox will not commit another crime.  *United States v. Redemann*, 295 F. Supp. 2d 887, 897 (E.D. Wis. 2003).

For the same reasons a non-custodial sentence is sufficient to achieve specific deterrence, it is also sufficient to achieve general deterrence.  A felony conviction, coupled with a sentence of probation, provide adequate disincentives to others who might consider committing crimes for which Mr. Cox was convicted.  As the Supreme Court observed in *Gall v. United States*, 552 U.S. 38, 48 (2007):

> We recognize that custodial sentences are qualitatively more severe than probationary sentences of equivalent terms.  Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty . . . Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases, receiving permission from, their probation officer or the court.  They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking.  Most probationers are also subject to individual "special conditions" imposed by the court.

Courts have similarly observed, "when a judge chooses between a prison term and probation, she is not choosing between punishment and no punishment.  Probation is less severe than a prison term, but both are punishment.  And as the Supreme Court has recognized, probation is *significant* punishment." *United States v. Leitch*, 2013 WL 753445, at *12 (E.D.N.Y. Feb. 2, 2013)

(emphasis in original).  *See also, United States v. Coughlin*, 2008 WL 313099, at *5 (W.D. Ark. Feb. 1, 2009) ("Home detention and probation can be severe punishments, hugely restrictive of liberty, highly effective in the determent of crime and amply retributive.").

Given the totality of what Mr. Cox has already endured for over 5 years, and the additional imposition of a sentence of probation, any citizen in his circumstances "need only consider what happened to [Stephen Cox] in order to consider [committing a similar offense]; thus, general deterrence [is] served."  *Redemann*, 295 F. Supp. 2d at 897.

### 3.      Proportionality in Sentencing

Section 3553(a)(6) counsels courts "to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  *See United States v. Ghailani*, 733 F.3d 29, 55 (2d Cir. 2013).  A non-custodial sentence would be consonant with the sentences imposed on other defendants in related cases, several of which are ████████████ ████████████████████████████████.

For example, Joe and Ken Nelson ran two corrupt distribution companies that funneled black market medications to Green Valley.  ████████████████████████████████████ ██████████████████████████████  Mr. Cox also had a far lesser role: he merely worked for the Nelsons.  Unlike the Nelsons, Mr. Cox was not the founder and operator of two illicit businesses.  Joe Nelson, whose applicable Guidelines range was 70-87 months' imprisonment, capped by a 36-month statutory maximum, was sentence to 5 years' probation, including 12 months of home confinement.  Ken Nelson, whose applicable Guidelines range was 108-135 months' imprisonment, received a sentence of 18 months in prison.

Randy Crowell was the leader in the scheme and received a leadership enhancement.  His applicable Guidelines range was 108-135 months' imprisonment.  Mr. Cox worked for Crowell and had a far lesser role.  Crowell, ██████████████████████ received a sentence of 60 months'

imprisonment.  Finally, Alex Oria was one of the highest-level aggregators who supplied significant quantities of black-market drugs to Green Valley and numerous other suppliers.  His applicable Guidelines range was 235-293 months' imprisonment.  According to the government, Oria "was involved in a significantly wider array of criminal conduct unrelated to Cox."  He was sentenced to time served, which was approximately 60 months' imprisonment.

Mr. Cox had a lesser role than all these defendants.  He worked for all of them, except Oria, mainly in a warehouse worker capacity.  ███████████████████████████████████ ████████████ Moreover, given the time that has passed since the government filed charges against Mr. Cox, he essentially has already served a 5½-year term of probation.  Under these circumstances, a non-custodial sentence is proportional.

## VI.    <u>CONCLUSION</u>

Mr. Cox committed serious offenses for which he has made every effort to atone and from which he has reformed.  He confessed to his wrongdoing ████████████████████████ ██████████████    He poses no danger to the public and has been a productive member of society for several years.  He has effectively satisfied all standard conditions of a 5½-year term of probation since his self-surrender in 2014.  None of the purposes of the sentencing laws would be furthered by a sentence of imprisonment.  We respectfully request the Court to impose a non-custodial sentence for Mr. Cox, which is sufficient, but not greater than necessary, to achieve the purposes of federal sentencing under 18 U.S.C. §3553(a).

<u>/s/ Thomas C. Frongillo</u>
Thomas C. Frongillo
PIERCE BAINBRIDGE BECK PRICE &
HECHT, LLP
One Liberty Square, 13th Floor
Boston, MA 02109
Telephone: (617) 401-7289
Facsimile: (617) 313-7837
tfrongillo@piercebainbridge.com

Melissa Madrigal
PIERCE BAINBRIDGE BECK PRICE &
HECHT, LLP
277 Park Avenue
New York, NY  10172
Telephone: (212) 972-0201
Facsimile: (646) 968-4125
mmadrigal@piercebainbridge.com

DATE:  July 15, 2019

*Attorneys for Stephen  J. Cox*

## **CERTIFICATE OF SERVICE**

I, Thomas C. Frongillo, hereby certify that on this day, July 15, 2019, I served a copy of the Sentencing Memorandum of Stephen J. Cox by electronic mail and **hand-delivery** to Assistant United States Attorney, Edward B. Diskant at United States Attorney's Office for the Southern District of New York, The Silvio J. Mollo Building, One Saint Andrew's Plaza, New York, New York, 10007.

/s/Thomas C. Frongillo
Thomas C. Frongillo

DATE:  July 15, 2019